UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| In Re: | ) | Chapter 7 |
| | ) | |
| THE CAK HAG CAKE AND DESSERT STUDIO, | ) | Case No. 20-64237-LRC |
| | ) | |
| _____Debtor._____ | ) | |
| | ) | |
| BEL ENSO, LLC, | ) | |
| | ) | |
| Movant, | ) | CONTESTED MATTER |
| v. | ) | |
| | ) | |
| THE CAK HAG CAKE AND DESSERT STUDIO | ) | |
| | ) | |
| Respondent. | ) | |

## MOTION FOR RELIEF FROM AUTOMATIC STAY

COMES NOW Bel Enso, LLC ("Landlord"), creditor in the above-styled proceeding, and files this motion seeking entry of an Order providing it relief from the automatic stay of 11 U.S.C. § 362(a) in order to proceed with its dispossessory action, obtain a writ of possession and conduct an eviction at 880 Glenwood Avenue, SE, Suite E, Atlanta, Georgia 30316 (the "Premises"). In support of this Motion, Landlord shows the Court as follows:

## I.    Background

1.

On or about October 12, 2016, Landlord rented the Premises to the Debtor pursuant to a Lease Agreement (the "Lease").  A true and correct copy of the Lease is attached hereto as **Exhibit A**.

2.

Prior to the Petition Date, Debtor failed to pay the monthly rent and other charges due under the Lease.  On February 20, 2020, Landlord filed a dispossessory proceeding in the Magistrate Court of Fulton County, Case No. 20-ED-158433 seeking past due rent of $10,206.81 and possession of the Premises.

3.

On February 26, 2020, Landlord's counsel sent the Debtor a letter terminating the Lease.  True and correct copies of the letter and the delivery receipts are attached hereto as **Exhibit B**.

4.

Debtor file the instant bankruptcy case on March 9, 2020.  The filing of the bankruptcy case stayed the dispossessory action.

2

5.

Debtor filed the petition *pro se* and the U.S. Trustee has moved to dismiss the case.

## II.    Argument and Citations of Authority

The Court must grant relief from the stay of § 362(a) "for cause, including the lack of adequate protection of an interest in the property of such party in interest." 11 U.S.C. § 362(d)(1). In the instant case, cause exists for relief from stay because the Landlord is not adequately protected. Landlord terminated the Lease pre-petition. Accordingly, the Debtor cannot assume the Lease in the Chapter 11 case. The Debtor is also continuing to use the Premises without paying rent for it. The Landlord is denied the ability to collect rent and realize the benefits of ownership of the Premises.

Landlord's administrative claim for the rent accruing post petition is not adequate protection. The Debtor has paid a total of $800.00 in rent in the past five (5) months. Debtor has not demonstrated any ability to pay for the post-petition use of the Premises.

## III.    Conclusion

Because the Landlord lacks adequate protection for Debtor's use of the

Premises, the Court should grant the Landlord stay relief in order to proceed with its dispossessory proceeding, obtain a writ of possession for the Premises and conduct an eviction at the Premises.

WHEREFORE, Landlord moves for and order granting relief from stay to proceed with the pending dispossessory proceeding, obtain a writ of possession for the Premises and conduct an eviction at the Premises and for such other and further relief as is just and proper.

This 12th day of March, 2020.

/s/ J. Carole Thompson Hord
J. CAROLE THOMPSON HORD
GEORGIA BAR NO. 291473

*Attorney for Movant*

SCHREEDER, WHEELER & FLINT, LLP
1100 Peachtree Street, N.E.
Suite 800
Atlanta, Georgia 30309-4516
Telephone:  (404) 681-3450
Email:      chord@swfllp.com

# EXHIBIT A

**LEASE AGREEMENT**

**Between**

**BEL ENSO, LLC**

**As Landlord**

**AND**

**CAKE HAG CAKE AND DESSERT STUDIO, LLC**

**As Tenant**

**THIS LEASE DOES NOT BECOME EFFECTIVE UNTIL EXECUTED
AND DELIVERED BY BOTH LANDLORD AND TENANT**

## TABLE OF CONTENTS

| ARTICLE/SECTION | TITLE |
|---|---|
| **ARTICLE I** | **DEFINITIONS AND FUNDAMENTAL PROVISIONS** |
| Section 1.1 | Landlord and Tenant Addresses |
| Section 1.2 | Common Areas |
| Section 1.3 | Lease Term |
| Section 1.4 | Minimum Rent |
| Section 1.5 | Permitted Use |
| Section 1.6 | Permitted Trade Name |
| Section 1.7 | Premises |
| Section 1.8 | Prepaid Minimum Rent |
| Section 1.9 | Rental Commencement Date |
| Section 1.10 | Security Deposit |
| **ARTICLE II** | **DEMISE OF PREMISES** |
| Section 2.1 | Lease |
| Section 2.2 | Acceptance of Premises by Tenant |
| Section 2.3 | Surrender of Premises |
| **ARTICLE III** | **RENT AND OTHER CHARGES** |
| Section 3.1 | Minimum Rent |
| Section 3.2 | Utilities |
| Section 3.3 | Security Deposit |
| Section 3.4 | Rent |
| **ARTICLE IV** | **PERMITTED USE** |
| Section 4.1 | Use |
| Section 4.2 | Control by Landlord |
| Section 4.3 | Hazardous Substances |
| Section 4.4 | Taxes |
| **ARTICLE V** | **ALTERATION, REPAIR AND MAINTENANCE** |
| Section 5.1 | Alterations by Tenant |
| Section 5.2 | Repairs by Tenant |
| Section 5.3 | Liens |
| Section 5.4 | Signs |
| **ARTICLE VI** | **CASUALTY AND CONDEMNATION** |
| Section 6.1 | Casualty |
| Section 6.2 | Condemnation |
| **ARTICLE VII** | **INSURANCE AND INDEMNIFICATION** |
| Section 7.1 | Insurance |
| Section 7.2 | Indemnification and Release |

Initial 

**ARTICLE VIII**                     **DEFAULT AND REMEDIES**

Section 8.1                  Events of Default
Section 8.2                  Remedies upon Default
Section 8.3                  General


**ARTICLE IX**                       **ASSIGNMENT AND SUBLETTING**

Section 9.1                  Assignment and Subletting


**ARTICLE X**                        **ATTORNMENT AND SUBORDINATION**

Section 10.1                 Attornment
Section 10.2                 Subordination


**ARTICLE XI**                       **MISCELLANEOUS**

Section 11.1                 Attorney's Fees
Section 11.2                 Late Charges
Section 11.3                 Accord and Satisfaction
Section 11.4                 Time of Essence
Section 11.5                 Holding Over
Section 11.6                 Severability
Section 11.7                 Brokers
Section 11.8                 Waiver
Section 11.9                 Right of Entry
Section 11.10                Successors and Assigns
Section 11.11                Headings, Captions and References
Section 11.12                Survival of Obligations
Section 11.13                Landlord and Tenant Relationship
Section 11.14                Notices
Section 11.15                Representations
Section 11.16                Landlord's Liability
Section 11.17                Jurisdiction
Section 11.18                Estoppel Certificates
Section 11.19                Entire Agreement
Section 11.20                Exhibits and Addenda
Section 11.21                Sustainable Community
Section 11.22                Force Majeure
Section 11.23                Security
Section 11.24                Guaranty
Section 11.25                Project Amenities
Section 11.26                Early Occupancy
Section 11.27                Temporary Parking


EXHIBIT A                   Site Plan
EXHIBIT B                   Rules and Regulations
EXHIBIT C                   Tenant's Work
EXHIBIT D                   Guaranty – Katie and Sheila Sweeney
EXHIBIT E                   Guaranty – Mark Sayeg

Initial 

## LEASE AGREEMENT

THIS LEASE AGREEMENT (the "Lease") is made and entered into this _12th_ day of _October_, 2016, between **BEL ENSO, LLC**, a Delaware limited liability company ("Landlord") and **CAKE HAG CAKE AND DESSERT STUDIO, LLC**, a Georgia limited liability company ("Tenant").

### WITNESSETH:

FOR GOOD AND VALUABLE CONSIDERATION, the receipt, adequacy and sufficiency of which is hereby acknowledged, Landlord and Tenant, intending to be legally bound, hereby agree as follows:

### ARTICLE I

### DEFINITIONS AND FUNDAMENTAL PROVISIONS

1.1    Addresses:

Landlord
Bel Enso, LLC
c/o Eaton Vance Management
2 International Place
Boston, Massachusetts 02110
Attention: REIG, Director of Asset
Management

Tenant
Cake Hag Cake and Dessert Studio, LLC
1525 Terrell Mill Place SE, Unit H
Marietta, GA 30067

1.2    Common Areas:    Those areas, facilities, utilities, improvements, equipment and installations, in the Project which are from time to time designated by Landlord for the nonexclusive use or benefit of Landlord and tenants of the Project, their employees, agents, customers, licensees, guests and invitees.

1.3    Lease Term:  The Tenant shall have and hold the Premises for an initial term of five (5) years and two (2) months (the "Initial Term") beginning on November 1, 2016 (the "Commencement Date") and ending on December 31, 2021, ("Expiration Date") unless sooner terminated as hereinafter provided.

1.4    Minimum Rent:

| Period | Monthly Rent | Rent per square foot |
|---|---|---|
| 11/1/16 – 12/31/16 | $0.00 | $0.00 |
| 1/1/16 - 10/31/17 | $2,131.50 | $29.00 |
| 11/1/17 - 10/31/18 | $2,195.45 | $29.87 |
| 11/1/18 - 10/31/19 | $2,261.31 | $30.77 |
| 11/1/19 - 10/31/20 | $2,329.15 | $31.69 |
| 11/1/20 - 10/31/21 | $2,399.02 | $32.64 |
| 11//1/21 – 12/31/21 | $2,470.99 | $33.62 |

1.5    Permitted Use:  Tenant shall use the Premises solely for the following permitted use and for no other purpose whatsoever:  retail bakery specializing in custom cakes, pies and selling cakes by the slice, pies by the slice, bars and brownies and breakfast on Saturday mornings.

1.6    Permitted Trade Name: The Cake Hag

1.7    Premises:  Approximately 882 rentable square feet located at 880 Glenwood Avenue, Suite E, Atlanta, Fulton County, Georgia 30318 (the "Premises") as more particularly described on Exhibit "A" attached hereto which is located in and a part of the Enso apartment project (the "Project").

1.8    Prepaid Minimum Rent:  Tenant shall pay Landlord $2,131.50 upon the execution of the Lease to be applied to the monthly Minimum Rent first due and payable by Tenant hereunder.

3

Initial 

1.9    <u>Rental Commencement Date</u>: November 1, 2016

1.10    <u>Security Deposit</u>: $2,470.99 to be paid upon Tenant's execution of the Lease.

**ARTICLE II**
**DEMISE OF PREMISES**

2.1    <u>Lease:</u>  Landlord hereby leases and demises to Tenant the Premises together with the nonexclusive right to use the Common Areas subject to the Rules and Regulations, and other provisions of this Lease.

2.2    <u>Acceptance of Premises by Tenant</u>:  Tenant agrees to accept the Premises in an "AS-IS, WHERE-IS" condition as tendered by Landlord.  Tenant agrees that no representations with respect to the conditions of the Premises and no promises to decorate, alter, repair or improve, the Premises have been made by Landlord, except that the HVAC system, plumbing and electric (outlets and fixtures) are in good working order as of November 1, 2016.

Promptly upon the tender of possession of the Premises by Landlord to Tenant, Tenant shall commence and thereafter diligently pursue to completion all of Tenant's work in the Premises in strict accordance with plans and specifications approved by Landlord.  Tenant agrees to submit to Landlord within thirty (30) days after the date of this Lease, plans and specifications in such detail as Landlord may reasonably request covering Tenant's work as specified in <u>Exhibit "C"</u> and any other work which Tenant proposes to do in the Premises ("Tenant Work").  Such plans and specifications will comply with all requirements set forth in <u>Exhibit "C"</u>.  Tenant shall not commence Tenant Work in the Premises until Landlord has approved such plans and specifications in writing, or until Landlord has otherwise approved commencement of Tenant's work, which approval shall not be unreasonably withheld or delayed.

2.3    <u>Surrender of Premises</u>: At the expiration, or earlier termination, of the Lease Term, Tenant shall surrender the Premises to Landlord in a good and broom-clean condition, reasonable wear and tear excepted.  Tenant shall promptly repair any damage to the Premises caused by the removal of any furniture, trade fixtures or other property permitted to be removed by Tenant from the Premises.

**ARTICLE III**
**RENT AND OTHER CHARGES**

3.1    <u>Minimum Rent</u>:  Except for the Prepaid Minimum Rent paid by Tenant hereunder, Tenant hereby covenants to pay Minimum Rent, in advance, on a monthly basis on the first day of each calendar month during the Lease Term without demand, deduction, or setoff whatsoever, it being specifically agreed and understood that the covenants of Tenant to pay Minimum Rent and all other Rent set forth in this Lease, are separate and distinct covenants of the Tenant, not contingent upon the performance of any other terms or conditions of this Lease.  Minimum Rent for any partial calendar month during the Lease Term shall be prorated on a per diem basis.

3.2    <u>Utilities</u>:  Tenant shall promptly pay all charges for utilities and other services furnished to the Premises whether by Landlord or the applicable utility company.  Landlord shall not be liable for any interruptions or curtailment in utility services whether for alteration, repair, or improvement, of the Premises or the Project, or otherwise.

Tenant shall contract for, in its own name, and shall pay before delinquency, for all utility services rendered or furnished to the Premises, including heat, air conditioning, chilled water, domestic water, gas, electricity, fire protection, sewer rental, sewage treatment facilities and the like, together with all taxes levied or other charges on such utilities.  If Landlord shall supply any such services, or if any such services are required to be paid for by Landlord under a master meter, Tenant shall purchase same from Landlord at charges not in excess of the charges Tenant would have paid to any public utility corporation or governmental agency in the area supplying the same or similar service.  If required to supply any such services, Landlord, at its sole option, may elect the companies which will provide such services to the Premises.  Any such charges for service supplied by Landlord shall be deemed Additional Rent and shall be due and payable within ten (10) days after billings therefor are rendered to Tenant.  In no event shall Landlord be liable for the quality, quantity, failure or interruption of such service to the Premises.  Tenant's

4

Initial 

obligations for the payment of charges due during the term of this Lease pursuant to this Article shall survive the expiration or termination of this Lease.

Tenant shall be responsible for disposal of Tenant's own garbage, but may use the Project's garbage and recycling receptacles at no additional charge to Tenant. Notwithstanding the foregoing, in the event that Tenant's use of the Premises results in increased charges to Landlord for garbage collection or other sanitary services, Tenant shall reimburse Landlord for such increased charges within ten (10) days after demand therefor.

3.3    Security Deposit:    Tenant has concurrently with the execution of this Lease deposited with Landlord the Security Deposit which shall serve as security for the full performance of every term and provision of the Lease by Tenant. Landlord may apply all or any part of the Security Deposit to cure any default by Tenant hereunder, and Tenant shall promptly restore to the Security Deposit all amounts so applied upon invoice. If Tenant shall fully perform each term and provision of this Lease, any portion of the Security Deposit which has not been appropriated by Landlord in accordance with the provisions hereof shall be returned to Tenant, without interest, within thirty (30) days after the expiration of the Lease Term.

3.4    Rent:    As used herein, the term "Rent" shall include Minimum Rent and all other additional charges or sums payable to Landlord hereunder. All Rent shall be paid without demand, deduction or setoff whatsoever.

**ARTICLE IV**
**PERMITTED USAGE**

4.1    Use:    Tenant covenants to open for business within 90 days of the Commencement Date and to operate throughout the entire Term for the Permitted Use. Tenant agrees not to abandon or vacate the Premises during the Term. Tenant shall use, occupy and operate in the whole of the Premises solely for the Permitted Use and for no other purpose whatsoever. Tenant covenants to continuously operate upon the whole of the Premises solely utilizing the Permitted Trade Name. Tenant shall only operate its business in a first class manner consistent with the area of the Project. Tenant shall be permitted to be open no earlier than 7:00 a.m. and close no later than 9:00 p.m. Monday through Sunday.

Subject to applicable laws and codes, Tenant shall be permitted to place one small table and 2 chairs in the side walk in front of the Premises so as not to interfere with pedestrian traffic including wheelchair access. Tenant shall keep the table and chairs in good condition.   City may remove or not allow the table and chairs as it is a City Easement location and Landlord has no requirement to provide as an option if that is the case.

Tenant shall not, without Landlord's prior written consent, keep anything within the Premises, or use the Premises for any purpose which increases the insurance premium cost or invalidates any insurance policy carried on the Premises or the Project, and Tenant shall pay as Rent the amount of any such increase promptly upon demand by Landlord. Tenant shall observe faithfully and comply strictly with all rules and regulations which landlord may from time to time adopt for the safety, operation, care and cleanliness, of the Project or the preservation of good order therein (the "Rules and Regulations"). Landlord shall not be liable to Tenant for any violation of the Rules and Regulations, or for the breach of any covenant or condition in any lease, by any other tenant in the Project. Tenant shall not use the Common Areas (including sidewalks) for any purpose without Landlord's prior written consent.

Tenant's operations shall not cause any nuisance to the residents and/or other tenants at the Project, including but not limited to any nuisance arising from noise, smells or refuse from the Premises. Tenant shall ensure that no noxious odors or vibrations emanate from the Premises. Customary smells from baking are not considered noxious odors. Odors associated with the regular evacuation of the grease trap for the Premises that last no more than thirty (30) minutes are also permissible.

The Premises may not be used or operated, in whole or in part, for any of the following: (1) the operation of a so-called "head shop" or other business devoted to the sale of articles or merchandise normally used or associated with illegal or unlawful activities such as, but not limited to, the sale of paraphernalia used in connection with marijuana or controlled drugs or substances, (2) a gun shop, shooting gallery or firearms range, (3) a so-called message parlor or

5                    Initial 

any business which sells, rents or permits the viewing of so-called "adult" or pornographic materials such as, but not limited to, adult magazines, books, movies, photographs, sexual aids, sexual articles and sex paraphernalia, (4) for the sale or distribution of any flammable liquids, gases or other Hazardous Materials as defined under this Instrument, (5) an off-track betting parlor or arcade, (6) a liquor store or other business whose primary business is the sale of alcoholic beverages for off-site consumption, (7) a burlesque or strip club, or (8) any other illegal activity.

Tenant shall be responsible for obtaining all permits and licenses necessary for the operation of its business within the Premises, including but not limited to businesses licenses. Tenant shall provide Landlord with copies of all applicable permits and licenses on an annual basis.

4.2     Control by Landlord:  Landlord shall have the right at all times, in its sole discretion, to change the size, location, elevation, nature or use of any portion or all of the Common Areas, the Project, or any part thereof, as Landlord may from time to time determine, including the right to change the size thereof, to erect buildings thereon, to sell or lease part or parts thereof, to change the location and size of the landscaping and buildings, and to make additions to, subtractions from, or rearrangements of, said buildings.

4.3     Hazardous Substances:   Tenant shall not generate, store, treat, dispose of, install or otherwise use any hazardous substances on, in, under, or in any way related to, the Premises or any other portion of the Project, or cause or permit any such generation, storage, treatment, disposal, installation or other use with respect thereto.  Tenant shall fully indemnify and hold Landlord harmless from any liability, damage, cost or expense that Landlord might otherwise suffer from Tenant's failure to fully comply with the terms and provisions of this Section. "Hazardous Substances" means and includes any of the substances, materials, elements, or compounds, that are contained in the list of hazardous substances adopted by the United States Congress or the EPA or any substances, materials, elements or compounds affected by any other federal, state or local statute, law, ordinance, code, rule, regulation, order or decree, now or at any time hereafter in effect, regulating, relating to, or imposing liability or standards of conduct concerning, any hazardous, toxic, dangerous, restricted or otherwise regulated waste, substance or material.

4.4     Taxes.  Tenant shall pay any and all taxes (including assessments and license fees) assessed or imposed upon Tenant's fixtures, furniture, appliances and personal property located in the Premises or otherwise levied against Tenant's business operations, including but not limited to sales taxes.  Landlord shall pay all property taxes levied against the Project.

## ARTICLE V
## ALTERATION, REPAIR AND MAINTENANCE

5.1     Alterations by Tenant:  Tenant shall not make any alterations (including, but not limited to, alterations to the exterior, the storefront, signs and/or utility lines or systems within or serving the Premises), nor secure any fixture or apparatus, to the Premises without Landlord's prior written approval, and Tenant shall promptly remove upon order from Landlord, any decoration or alteration made or installed upon the Premises.  All alterations, fixtures, betterments and improvements, made to or installed upon the Premises, shall remain upon the Premises and shall become Landlord's property upon the expiration or earlier termination of this Lease, unless Landlord shall require Tenant to restore the Premises to its original condition, except that Tenant shall, if not in default, be permitted to remove its trade-fixtures from the Premises prior to the expiration or sooner termination of the Lease, provided Tenant repairs any damage caused by the removal.

5.2     Repairs by Tenant:  Tenant shall keep by routine maintenance, repair and replacement, at its sole cost and expense, the interior of the Premises, together with the storefront and all doors and windows of the Premises, and all electrical, plumbing, heating, ventilating, air conditioning, sprinkler systems and any other mechanical installations serving the Premises or located therein, whether or not in or under the floor slab or on the roof of the Premises, in good condition and working order.  Tenant agrees to employ a suitable contractor approved by Landlord to perform Tenant's obligations for maintenance of the heating, cooling and ventilating units of the Premises, including at least semi-annual inspections and cleaning of the system together with such servicing as each such inspection shall disclose, or as shall otherwise be reasonably required by Landlord.  Tenant shall provide Landlord with a copy of its contract for the maintenance of the heating, cooling and ventilation system.  In the event Tenant fails to perform

Initial

its maintenance, repair, or replacement obligations as provided herein, Landlord may, at its option, perform such remedial action on behalf of Tenant, and Tenant agrees to pay to Landlord, as Additional Rent, the cost thereof plus fifteen percent (15%) overhead promptly upon demand by Landlord.

5.3     Liens:  Tenant hereby indemnifies Landlord against, and shall keep the Premises and the Project free from, liens for any work performed, material furnished or obligations incurred by or on behalf of Tenant and shall discharge or bond any lien filed within ten (10) days after filing.

5.4     Signs:  Tenant shall submit to Landlord three (3) copies of signage drawings for approval prior to fabrication and installation. These drawings are required thirty (30) days following execution of the lease.  Landlord shall not unreasonably withhold or delay its approval of the signage.  Tenant shall be responsible for all permits, related fees or penalties applicable to the sign installation.

Tenant shall not place or suffer to be placed and maintained on the exterior of the Premises any sign, awning, advertising matter or other thing of any kind, and will not place or maintain any decorating, lettering or advertising matter on the glass of any window or door of the Premises without first obtaining Landlord's written approval thereof.

## ARTICLE VI
## CASUALTY AND CONDEMNATION

6.1     Casualty:  Landlord shall have the right, upon thirty (30) days prior written notice to Tenant, to terminate this Lease in the event (i) the Premises is damaged by fire or other casualty to the extent of more than ten percent (10%) of the replacement cost thereof, (ii) the Project is damaged by fire or other casualty to the extent of ten percent (10%) or more of the replacement cost thereof, or (iii) any damage to the Premises cannot, in Landlord's sole discretion, be repaired within ninety (90) days of the date of such damage.  If Landlord should elect to repair or rebuild the Premises because of any damage or destruction, Tenant shall replace all work and improvements originally installed or performed by Tenant at Tenant's expense.

6.2     Condemnation:  If the whole of the Premises, or so much thereof as to render the balance unusable by Tenant, shall be taken under power of eminent domain, or otherwise transferred in lieu thereof, or if any part of the Project is taken and its continued operation is not in Landlord's sole opinion, economical, this Lease shall automatically terminate as of the date possession is taken by the condemning authority.  No award for any total or partial taking shall be apportioned, and Tenant hereby unconditionally assigns to Landlord any award which may be made in such taking or condemnation.  In the event of a partial taking which does not result in the termination of their Lease, Minimum Rent shall be apportioned according to the part of the Premises remaining usable by Tenant.

## ARTICLE VII
## INSURANCE AND INDEMNIFICATION

7.1     Insurance:  Tenant shall maintain at its sole expense, commencing upon the date Tenant takes possession of the Premises and continuing throughout the Lease Term and the Option Term (if applicable), commercial liability insurance covering the Premises in a combined single limit amount of not less than $1,000,000.00, naming Landlord, Landlord's Property Manager and any mortgagee(s) of the Project as additional insureds thereunder.  Tenant shall also keep in force, at its sole expense, fire and extended coverage insurance for the full replacement value of Tenant's improvements and Tenant's property, including, but not limited to, inventory, trade fixtures, furnishings, and other personal property, naming Landlord and any mortagagee(s) of the Project as additional insureds thereunder.  The fire and extended coverage insurance maintained by Tenant shall be written so as to provide that the insurer waives all right of recovery by way of subrogation against Landlord in connection with any loss or damage covered by the policy (Tenant for itself, its successors and assigns, by virtue of any casualty to the Premises or the Project).  In addition, Tenant shall keep in force workman's compensation or similar insurance to the extent required by law.  Tenant shall deliver said insurance policies or certificates thereof to Landlord within ten (10) days of the commencement of the Lease Term;  Landlord having the right, at its sole discretion, to approve the insurance carrier utilized by Tenant in connection with the Premises.  Should Tenant fail to affect the insurance called for herein, Landlord may, at its sole option, procure said insurance and pay the requisite premiums, in which event, Tenant shall pay all sums so expended plus fifteen percent (15%) as overhead to Landlord, as Additional

7

Initial 

Rent, immediately upon demand. Each insurer under the policies required hereunder shall agree by endorsement on the policy, or by independent instrument furnished to Landlord, that it will give Landlord at least fifteen (15) days prior written notice before any policy or policies affecting the Premises shall be altered or canceled.

7.2.    Indemnification and Release:    Tenant hereby agrees to indemnify and hold Landlord, Landlord's Property Manager and any mortgagee(s) of lender holding a deed to secure debt on the Project, harmless from any and all claims, damages, liabilities or expenses arising out of any of the following: (a) Tenant's use of the Premises or the Project, (b) any and all claims arising from any breach or default in the performance of any obligation of Tenant, (c) any act, omission or negligence of Tenant, its customers, agents, employees, invitees or contractors. Tenant further releases Landlord from liability for any damage to persons or to Tenant's fixtures, equipment, inventory or personal property within the Premises or Project, sustained by Tenant or any other person claiming by, through, or under, Tenant due to the condition of the Premises, the Project, or any part thereof, or any appurtenances thereto, becoming out of repair, or due to the happening of any incident. This release includes without limitation, any damage to Tenant's fixtures, property, inventory or equipment caused by water, snow, windstorm, tornado, gas, steam, electrical wiring, sprinkler system, plumbing, heating and air-conditioning apparatus, and from any acts or omissions of co-tenants or other occupants of the Project. It is intended and agreed that Landlord shall not be liable for any damage to or loss of Tenant's personal property, inventory, fixtures or improvements, from any cause whatsoever, and Tenant shall maintain and look to property insurance required to be obtained by Tenant for protection against loss due to damage to Tenant's property.

## ARTICLE VIII
## DEFAULT AND REMEDIES

8.1    Events of Default:    It shall be an event of default if Tenant (i) fails to pay all or any portion of any sum due from Tenant hereunder or pursuant to any exhibit hereto within five (5) days following the due date; (ii) fails to cease all conduct prohibited hereby immediately upon receipt of written notice from Landlord; (iii) fails to take actions in accordance with the provisions of written notice from Landlord to remedy Tenant's failure to perform any of the terms, covenants and conditions of this Lease; (iv) fails to conduct business in the Premises as herein required; (v) commits an act in violation of this Lease which Landlord has previously notified Tenant to cease more than once in any Lease Year; (vi) becomes bankrupt, insolvent or files any debtor proceeding, takes or has taken against Tenant any petition of bankruptcy; takes action or has action taken against Tenant for the appointment of a receiver for all or a portion of Tenant's assets, files a petition for a corporate reorganization; makes an assignment for the benefit of creditors, or if in any other manner Tenant's interest hereunder shall pass to another by operation of law (any or all of the occurrences in the subsection being deemed a default on account of bankruptcy for the purposes hereof and such default on account of bankruptcy shall apply to and include any guarantor of this Lease); (vii) commits waste to the Premises; or (viii) is otherwise in breach of Tenant's obligations hereunder and shall not have cured such default within twenty (20) days following written notice from Landlord.

8.2    Remedies upon Default:    Upon an event of default, Landlord may, at its option and without further notice to Tenant,

   (a)    Terminate this Lease, in which event Tenant shall immediately surrender the Premises to Landlord, and if Tenant fails to do so, Landlord may, without prejudice to any other remedy which it may have for possession or arrearage in rent, enter upon and take possession of the Premises and expel or remove Tenant and any other person who may be occupying said Premises or any part thereof, by force if necessary, without being liable for prosecution or any claim of damages therefor.

   (b)    Enter upon and take possession of the Premises and expel or remove Tenant and any other person who may be occupying said Premises or any part thereof, by force, if necessary, without being liable for prosecution of any claim for damages therefor.

   (c)    Enter upon the Premises, by force if necessary, without being liable for prosecution or any claim of damages therefor, and do whatever Tenant is obligated to do under the terms of this Lease, and Tenant agrees to reimburse Landlord on demand for any expenses, including, without limitation, reasonable attorneys' fees, which Landlord may incur in thus effecting compliance with Tenant's obligations under this Lease,

8

Initial 

and Tenant further agrees that Landlord shall not be liable for any damages resulting to Tenant for such action, whether caused by the negligence of Landlord or otherwise.

8.3    General:  Pursuit by Landlord of any of the foregoing remedies shall not preclude pursuit of any other remedy herein provided or any other remedy provided by law or at equity, nor shall pursuit by Landlord of any remedy herein provided constitute (a) an election of remedies thereby excluding the later election of an alternate remedy, or (b) waiver of any Rent, or other charges and assessments payable by Tenant to Landlord hereunder or of any damages accruing to Landlord by reason of the violation of any of the terms, covenants, warranties and provisions herein contained.  No action taken by or on behalf of Landlord shall be construed to be an acceptance of a surrender of this Lease.  Forbearance by Landlord to declare a default or enforce one or more of the remedies herein provided upon an event of default shall not be deemed or construed to constitute a waiver of such default.  In determining the amount of loss or damage which Landlord may suffer by reason of default by Tenant or the deficiency arising by reason of any re-letting of the Premises by Landlord if the Premises is re-let, allowance shall be made for the expenses of repossession and any repairs or remodeling undertaken by Landlord following repossession, together with brokerage fees, if any.  Tenant agrees to pay to Landlord all costs and expenses incurred by Landlord in the enforcement of this Lease.  Tenant shall remain liable for all Rent and other charges due under the Lease even after being evicted or vacating the Premises until the end of the Lease Term.

## ARTICLE IX
## ASSIGNMENT AND SUBLETTING

9.1    Assignment and Subletting:  Tenant shall not, either voluntarily or by operation of law, sell, assign, hypothecate or otherwise transfer this Lease, or sublet the Premises or any part thereof (all of the foregoing collectively referred to as a "Transfer"), without the express prior written consent of Landlord.  Tenant shall not be released from, and shall remain principally and primarily liable for, the full and prompt performance of each of the terms and provisions of this Lease following any Transfer.  The acceptance by Landlord of Rent following any Transfer shall not be deemed to be a consent by Landlord to any such Transfer, nor shall such acceptance of Rent be deemed a waiver of any right or remedy of Landlord hereunder.

## ARTICLE X
## ATTORNMENT AND SUBORDINATION

10.1    Attornment.  Tenant shall attorn and be bound to any of Landlord's successors under all the terms, covenants and conditions of this Lease for the balance of the Lease Term, as renewed or extended.  Tenant shall attorn to any lender or holder of a security deed or deed to secure debt and any purchaser at a foreclosure sale, such attornment to be self-executing and effective upon acquisition of title to the Project by any purchaser at a foreclosure sale or by any lender or holder of a security deed or deed to secure debt in any manner.  Tenant agrees to execute such further evidences of attornment as any lender or any purchaser at a foreclosure sale may from time to time request.  The Lease shall not be terminated by foreclosure or any other transfer of the Poject or Premises.  In the event of a foreclosure sale of the Project, the lender or any other purchaser at such foreclosure sale may, at their option, accept or terminate the Lease. Upon receipt of a written request from a lender as a result of Landlord's default under its Mortgage as defined herein, Tenant agrees to pay all Rents payable under the Lease to the lender.

10.2    Subordination.  This lease is, and shall be, subordinate to the lien of any mortgage, security deed, deed of trust, or the lien resulting from any other method of financing or refinancing now or hereafter in force in connection with the Project (collectively, "Mortgages"), and to any and all advances to be made under such Mortgages, and all renewals, modifications, extensions, consolidations, and replacements thereof.  The aforesaid provisions shall be self-operative, and no further instrument of subordination shall be required to evidence such subordination.  Tenant covenants and agrees to execute and deliver, upon demand, such further instrument or instruments subordinating this Lease on the foregoing basis to the lien of any such Mortgages as shall be requested by Landlord and any mortgagee(s) of the Project, Tenant hereby irrevocably appoints Landlord the attorney-in-fact of Tenant to execute and deliver such instrument or instruments within ten (10) days after written notice.

Initial 

## ARTICLE XI
## MISCELLANEOUS

11.1    Attorney's Fees: Tenant shall pay reasonable attorney's fees incurred by Landlord in the enforcement of any of the terms, covenants, or provisions of this Lease.

11.2    Late Charges: All Rent not paid when due shall bear interest at the highest legal rate not to exceed eighteen percent (18%) per annum calculated from the due date of such Rent. Tenant shall, in addition, pay as Additional Rent a fee of $50.00 for processing of late payments.

11.3    Accord and Satisfaction: No payment by Tenant or receipt by Landlord of a lesser amount than the charges herein stipulated shall be deemed to be other than on account of the earliest stipulated charges, nor shall any endorsement or statement on any check or letter accompanying any check or payment be deemed an accord and satisfaction, and Landlord may accept such check or payment without prejudice to Landlord's right to recover the balance of any amounts due hereunder or to pursue any other remedy provided herein.

11.4    Time of Essence: TIME IS OF THE ESSENCE OF THIS LEASE.

11.5    Holding Over: If Tenant holds over at the end of the Lease Term without the written consent of Landlord, Tenant shall be deemed a tenant-at-sufferance and Tenant shall pay to Landlord, during each month of such holdover period, as liquidated damages, a sum equal to double the highest amount of Rent paid by Tenant to Landlord during any month of the Lease Term; provided, however, acceptance of Rent by Landlord shall not be interpreted as a grant of permission for Tenant to continue in possession of the Premises.

11.6    Severability: In the event any provision of this Lease to any extent shall be deemed invalid or unenforceable, the remainder of this Lease shall not be affected thereby, and the Lease and the remaining provisions thereof shall be valid and enforceable to the full extent permitted by law.

11.7    Brokers: Tenant represents to Landlord that it was represented by Jonathon O Ken and Atlanta Commercial Real Estate Services, Inc. ("Tenant Broker") in connection with this Lease Agreement. Tenant indemnifies Landlord against any claims for brokerage commissions in connection with this Lease other than as set forth herein to Tenant Broker. Landlord represents that it was represented by Oakhurst Realty Partners, LLC ("Landlord Broker") in connection with this Lease. Landlord indemnifies Tenant against any claims for brokerage commissions in connection with this Lease other than as set forth herein to Landlord Broker. Landlord will pay Landlord Broker and Tenant Broker pursuant to separate agreements.

11.8    Waiver: No Waiver by Landlord of any provision of this Lease shall be deemed to be a waiver of any other provision hereof or of any subsequent breach by Tenant of the same provision. Landlord's consent to, or approval of, any act by Tenant shall not be deemed to render unnecessary the obtaining of Landlord's consent to, or approval of, any subsequent act. No agreement by Landlord to accept Tenant's surrender of the Premises shall be valid unless in writing from Landlord.

11.9    Right of Entry: Landlord shall have free access to the Premises at all reasonable times to inspect the Premises and to make such repairs, additions, improvements, changes, or alterations, to the Premises or the Project, as Landlord may elect. Landlord may place upon the Premises "For Rent" signs ninety (90) days before the expiration of this Lease.

11.10    Successors and Assigns: Except as otherwise provided herein, this Lease shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, personal representatives, executors, successors and assigns.

11.11    Headings, Captions and References: The Article and Paragraph captions contained in this Lease are for convenience only and do not in any way limit or amplify any terms or provisions hereof. The use of the terms "hereof", "hereunder", and "herein" shall refer to this Lease as a whole, except where noted otherwise.

11.12    Survival of Obligations: The provisions of this Lease with respect to any obligation of Tenant, including, without limitation, any indemnities of Tenant contained in this Lease, and

10

Initial 

Tenant's covenant to pay Rent, shall specifically survive the expiration or earlier termination of this Lease.

11.13  Landlord and Tenant Relationship:  Nothing herein contained shall be deemed or construed by the parties hereto, nor by any other party, as creating the relationship or principal and agent or of partnership or joint venture between the parties hereto.  No estate shall pass from Landlord to Tenant, and this Lease shall not be subject to levy or sale.

11.14  Notices:  Any notice required or permitted to be given hereunder shall be in writing and may be given by personal delivery, by any nationally or regionally recognized overnight delivery service such as Federal Express, or by U.S. Certified Mail, postage prepaid, return receipt requested.  If notice is to be sent to Landlord, such notice shall be addressed to Landlord, at the address set forth in Section 1.1 of this Lease.  If notice is to be sent to Tenant, such notice shall be addressed to Tenant at the address set forth in Section 1.1 of this Lease, or by posting such notice to the Premises.  Notices and demands shall be deemed to have been given (i) two days after the date of depositing in the U.S. Mail, if sent by Certified Mail, (ii) upon delivery if personally delivered, (iii) one day following deposit with overnight delivery service and (iv) upon posting, if posted to the Premises.

11.15  Representations:  Tenant acknowledges that neither Landlord nor Landlord's agents, employees, or contractors have made any representations or promises with respect to the Premises, the Project, or this Lease, except as expressly set forth herein.

11.16  Landlord's Liability:  In the event of any alleged default of Landlord, Tenant shall not seek to secure any claim for damages or indemnification by any attachment, levy, judgment, garnishment or other security proceedings against any property of the Landlord other than Landlord's equity in the Project.  Landlord as used herein, shall include any assignee or other successor of the original Landlord or its successors or assigns.

11.17  Jurisdiction:  The laws of the State of Georgia shall govern the interpretation, validity, performance, and enforcement, of this Lease.

11.18  Estoppel Certificates:  Within seven (7) days after written request by Landlord, Tenant shall execute, acknowledge, and deliver, to Landlord, or to such other party as may be designated by Landlord, a certificate stating that this Lease is in full force and effect and has not been modified, supplemented or amended in any way, except as indicated in such certificate; that all conditions and agreements hereunder to be performed by Landlord have been satisfied or performed, except as set forth in said certificate; that Tenant is not in default in the payment of Rent of any of the other obligations required of Tenant hereunder; and that Tenant has paid Rent as of the date set forth in the certificate.

11.19  Entire Agreement:  This Lease constitutes the entire agreement between the parties hereto with respect to the subject matter hereof and no subsequent amendment or agreement shall be binding upon either party unless it is signed by each party.  The submission of this Lease shall not constitute an offer to Lease by Landlord and this Lease shall not be binding unless and until it is signed by Landlord and Tenant.

11.20  Exhibits and Addenda:  All exhibits and addenda attached to this Lease are by this reference incorporated into this Lease.  Insofar as such exhibits or addenda conflict with any of the terms or provisions contained in the text of this Lease, the terms and provisions of such exhibit or addenda shall govern and control.

11.21  Sustainable Community.  Tenant acknowledges that the Project is an eco-friendly, environmentally sustainable development. Tenant agrees to employ and use eco-friendly products and sustainable business practices in its business operations to the greatest extent possible and practical. Landlord may from time to time request that Tenant modify its business practices to conform with sustainable and eco-friendly standards for the Project, so long as such requests do not impose a financial or operational hardship or undue burden on Tenant or Tenant's employees, customers or clients.

11.22  Force Majeure. Except for Tenant's monetary obligations hereunder, neither party shall be held responsible for delays in the performance of its obligations hereunder when caused by strikes, lockouts, labor disputes, acts of God, inability to obtain labor or materials or reasonable substitutes therefor, governmental restrictions, governmental regulations, governmental controls,

11

delay in issuance of permits, enemy or hostile governmental action, civil commotion, fire or other casualty, and other causes beyond the reasonable control of such party ("Force Majeure").

11.23   Security.   Tenant acknowledges and agrees that Landlord is not providing any security services with respect to the Premises and that Landlord shall not be liable to Tenant for, and Tenant waives any claim against Landlord with respect to, any loss by theft or any other damage suffered or incurred by Tenant in connection with any unauthorized entry into the Premises or any other breach of security with respect to the Premises.

11.24   Guaranty.   This Lease shall be conditioned upon and shall not take place unless and until the Guaranty attached to this Lease as Exhibit "D" and made a part hereof is executed by Katie Sweeney and Sheila "Maggie" Sweeney and the Guaranty attached to this Lease as Exhibit "E" and made a part hereof is executed by Mark Sayeg ("Guarantors").

11.25   Project Amenities.   Tenant is not allowed to use the Project swimming pool, fitness center, game room and cyber café/business lounge or other amenities at the Project reserved for the residents  as may exist from time to time in Landlord's sole discretion.

11.26   Early Occupancy.   In the event Tenant desires to take possession of the Premises before November 1, 2016, the Commencement Date and Rent Commencement Date will be automatically amended to be the date on which the Tenant takes possession.  The Term shall also be expanded so that the Expiration Date remains the same.  Tenant shall begin paying Rent two (2) months after the amended Commencement Date and Rent for that partial month shall be pro-rated at the initial monthly rate of $2,131.50 per month.

11.27   Temporary Parking.   In the event parking for customer picking up wedding cakes on Friday and Saturday is problematic for the Tenant, then Tenant may place one professional printed temporary sign in a parking space in the first floor of the parking garage which reserves the space for its wedding cake customers on Friday and Saturday for no more than two (2) hour blocks.  Landlord is not responsible for enforcing the temporary parking.  Tenant shall remove the temporary sign when it closes for business on Friday and Saturday.

IN WITNESS WHEREOF, the parties hereto have executed this Lease under seal the day and year first above written.

LANDLORD:

**BEL ENSO, LLC**

By: _____

_____
Witness

Print Name: _Robert Maslien_

Its: _Authorized Signator_

Date: _10-12-2016_


TENANT:

**THE CAKE HAG, LLC**

By: _____

_____
Witness

Print Name: _Sheila M. Sweeney_

Its: _President_

Date: _10·06·2016_

Initial _____

## EXHIBIT "A"

### PREMISES SITE PLAN

Premises

Suite I



Typical floor plan



Initial

## EXHIBIT "B"

### RULES AND REGULATIONS

1. There shall be no storage of any kind in the Common Areas.
2. The Common Areas must remain free from any trash or debris.
3. Tenant is responsible for cleaning up all cigarette butts and debris from its employees, invitees, guests and other persons entering onto the Project in connection with Tenant's operation of its business.
4. Tenant and its invitees and employees shall obey all posted parking sign and directives.
5. Tenant's invitees and customers may park on the first floor of the parking deck on a first come first service basis. The parking spaces within 100 feet of the front of any building must be left for customer's use only.
6. Landlord shall be permitted to designate an area for employee parking within the Project. No vehicles of Tenant or employees of Tenant may be parked on the Project during non-working hours.
7. In no event shall Tenant conduct or advertise any auction, fire, "going out of business", "lost our lease" or bankruptcy sale in or about the Premises. Tenant shall not use the public or Common Areas of the Project for business purposes or special events unless prior written approval has been received by Landlord. No soliciting or distribution of flyers or any promotional material in the Common Areas is permitted.
8. All deliveries or shipments to and from the Premises shall be made by way of the adjacent loading dock area and/or any other location designated by Landlord only after 7:00 a.m. and before 8:00 p.m.
9. Any signage which can be seen from outside of the Premises must be professionally made (not hand-lettered), framed, clipped to the ceiling grid system and approved in writing by Landlord. No rotating, flashing, neon or moving signs are permitted.
10. Any damage caused to the roof of the Premises or Project by repair/service personnel contracted by Tenant will be the responsibility of Tenant. Tenant must caution all repair/service personnel to avoid stepping on blisters, leaving foreign objects on roof, etc.
11. Tenant shall not play any loud music or allow for other noises to be heard outside the Premises.
12. Tenant's employees and visitors shall not have access or use of the Project's pool, fitness center, game room and cyber café/business lounge or other amenities of the Project reserved for the exclusive use of residents of the Project.

14

Initial 

**EXHIBIT "C"**

**TENANT WORK**

## SECTION I - GENERAL PROVISIONS

1. All Tenant Work shall be made between the hours of 8:00 a.m. and 7:00 p.m. Monday through Saturday. Tenant may request permission to perform work outside these hours from Landlord.

2. Tenant is required to provide Landlord with a copy of its certificate of occupancy issued upon the completion of the Tenant Work and prior to its opening for business.

3. Jurisdiction and Codes: The Premises is under the jurisdiction of the County and State in which the Property is located. All design and construction work shall comply with all applicable statues, ordinances, regulations, laws and codes, including but not limited to the following: The National Electric Code; the Guide of the American Society of Heating, refrigerating and air conditioning Engineers; requirements of the Landlord's fire insurance underwriter, and the requirements pertaining to any services and utilities furnished by local utility company; and all applicable State and County Ordinances and OSHA regulations.

4. Permits and Approvals: Building and other permits shall be obtained at Tenant's expense and posted in a prominent place within the Premises prior to the commencement of construction. Landlord's written approval shall be obtained by Tenant prior to the undertaking of any construction work which deviates from Tenant's working drawings and specifications, as approved by Landlord, and any other work not explicitly shown on said working drawings and specifications. Landlord's approval of the foregoing shall not constitute the assumption of any responsibility by Landlord for the accuracy or sufficiency thereof, and Tenant shall be solely responsible therefore.

5. Materials: Only new, first-class materials shall be used in the construction of the Premises.

6. Field Conditions: Tenant will verify conditions pertaining to the Premises from time to time prior to and after commencement of any Tenant Work.

7. No Structural work shall be completed without Landlords prior written consent.

## SECTION 2 - PROCEDURES AND SCHEDULES FOR TENANT'S WORK

1. Tenant shall, prior to the commencement of any Tenant Work, submit to Landlord, the following information:

   a. If applicable, the names, addresses and telephone numbers of the contractors Tenant intends to engage in the performance of the Tenant Work, which contractors shall be subject to the prior approval of Landlord.

   b. The actual commencement date of construction and the estimated date of completion of construction work, fixturing work, and the date of projected opening.

   c. All required licenses and permits.

   d. Tenant's plans and specifications ("Tenant's Plans"), which shall be subject to prior

Initial 

approval of Landlord.

2.  All contractors and/or sub-contractors performing work on the Premises must provide ,prior to commencing work, proof of workmen's compensation, employer's liability insurance as required by the State of Georgia and commercial general liability insurance with a minimum combined single limit of $1,000,000.00.

3.  All contractors engaged by Tenant shall be licensed contractors who are capable of performing quality workmanship.

4.  Tenant's contractor and construction shall comply in all respects with applicable Federal, State, and/or local statutes, ordinances, regulations, laws, and codes.  All required building and other permits in connection with any Tenant Work shall be obtained and paid for by the Tenant.

5.  Landlord shall have the right to perform on behalf of and for the account of Tenant, subject to reimbursement by Tenant, any of the Tenant Work which Landlord deems necessary to be done on an emergency basis and which pertains to structural components, the general utility systems for the Premises, and the erection of temporary barricades and temporary signs, per design criteria, during construction and/or the period following the opening of the center for business.

6.  All Tenant Work shall be subject to the inspection and approval of Landlord and Landlord's architect.

7.  Upon the completion of the Tenant Work, all facilities shall be in full use without defects.

8.  All Tenant Work shall be performed so as to cause a minimum of interference with other tenants, residents and the operation of the Project.  Tenant will take all precautionary steps to protect its facilities and the facilities of others affected by the Tenant Work and properly police same.  Construction equipment and materials are to be located in confined areas and truck traffic is to be routed in and from the site as directed by Landlord so as not to burden the operation of the Project or its residents.  Landlord shall have the right to order Tenant or any contractor of Tenant who willfully violates the above requirements to cease work and to remove himself and his equipment and his employees from the Property.

9.  Tenant agrees, at Tenant's sole cost and expense to construct Tenant Work, which are shown in Tenant's Plans.  Tenant shall cause all Tenant Work to be performed in a good, first-class, workmanlike manner, in accordance with Tenant's Plans using only contractors approved in advance by Landlord.

10. Tenant shall obtain fully executed and notarized lien waivers and affidavits, in a form satisfactory to Landlord and in compliance with Georgia law, from each contractor who has performed any Tenant Work and from each supplier who has supplied materials in connection with any Tenant Work, which lien waivers and affidavits (i) state that such party has been paid in full for work done and materials supplied through the end of the prior calendar month (ii) state that such party waives all lien rights and other claims against Landlord, through the date of the last payment and (iii) make such other statements as are reasonably required by Landlord;

11. Any approval by Landlord of or consent by Landlord to any plans, specifications or other items to be submitted to and/or reviewed by Landlord pursuant to the Lease including Tenant's Plans shall be deemed to be strictly limited to an acknowledgment of approval or consent by Landlord thereto and, whether or not the work performed by Landlord of any responsibility for the accuracy sufficiency or feasibility of any plans, specifications or other such items and shall not imply any acknowledgment, representation or warranty by Landlord that the design is safe, feasible, structurally sound or will comply with any legal or governmental requirements, and Tenant shall be responsible for all of the same.

Initial 

## EXHIBIT "D"
## LEASE GUARANTY

The undersigned guarantor(s), in consideration of ten and no/100 dollars ($10.00) and other valuable considerations, and of the leasing by **BEL ENSO, LLC**, as Landlord, to **CAKE HAG CAKE AND DESSERT STUDIO**, LLC as Tenant, of the leased premises located at 880 Glenwood Ave, Suite E, Atlanta, GA pursuant to and as defined in the Lease between them attached hereto, does hereby, on behalf of itself and its successors and assigns, unconditionally guarantee the payment of all rent and the performance by Tenant (and any of Teannt's assigns) of all of Tenant's obligations under said Lease, and further covenants and agrees with said Landlord, its successors and assigns, as follows:

(a) That if an event of default, as defined in said Lease, shall have occurred and be continuing, guarantor will on demand well and truly pay to Landlord any and all payments that will become due to Landlord under the Lease, and will well and truly perform all of the covenants in the Lease to be performed by Tenant, and in addition will pay all damages that may arise in consequence of such event of default and all reasonable attorney's fees that may be incurred by Landlord in enforcing Tenant's covenants and agreements set forth in the Lease or in enforcing the covenants and agreements of the guarantor herein.

(b) That at Landlord's option, guarantor may be brought into any action or proceeding commenced by Landlord against Tenant in connection with and based upon the Lease or any provision thereof, or Landlord may proceed separately against guarantor, and recovery may be had against guarantor in any such action or proceeding or in any independent action or proceeding against guarantor without any requirement that Landlord, its successors or assigns, first assert, prosecute or exhaust any remedy or claim against Tenant, its successors and assigns.

(c) That in the event of any bankruptcy, reorganization, winding-up or similar proceedings with respect to Tenant, no limitation of Tenant's liability under the Lease which may now or hereafter be imposed by any federal, state or other law of regulation applicable to such proceedings, shall limit the obligation of guarantor hereunder, which obligation is coextensive with Tenant's liability as set forth in the Lease without regard to any limitations applicable to such proceedings.

(d) That this Guaranty shall remain in full force and effect as to any renewal, extension, modification or amendment of the Lease and as to any assignee of Tenant's interest under the Lease, without notice of same to guarantor or request that guarantor consent to same.

(e) That the validity of this Guaranty and the obligations of guarantor hereunder shall not be terminated, affected or impaired by reason of any action which Landlord might take against Tenant, or by reason of any waiver of or failure to enforce any of the rights or remedies reserved to Landlord in the Lease or otherwise.

(f) That Landlord's interest under this Guaranty may be assigned by it by way of security or otherwise.

(g) Guarantor waives notice of any and all events of default under the Lease and all notices or demands which may be given by Landlord to Tenant.

(h) If this Guaranty is signed by more than one guarantor, then obligations herein are the joint and several obligation of each guarantor. As used herein, masculine pronouns include the feminine and neuter. This Guaranty binds and inures to the benefit of the Landlord, guarantor(s) and their heirs, successors and assigns.

[GUARANTY SIGNATURES ON FOLLOWING PAGE]

[SIGNATURE PAGE FOR GUARANTY]

IN WITNESS WHEREOF, the guarantor has signed and sealed this Guaranty as of the date
noted below.

GUARANTOR(S):

_____          _____
KATIE SWEENEY                       SHEILA SWEENEY

Dated: 10.06.2016                   Dated: 10.06.2016

Address: 1525 Terrell Mill Plc      Address: 1525 Terrell Mill Place

#H, Marietta GA 30067               #H, Marietta, GA 30067

Telephone: 678.760.6300            Telephone: 678-481-2959

18

## EXHIBIT "E"
## LEASE GUARANTY

The undersigned guarantor, in consideration of ten and no/100 dollars ($10.00) and other valuable considerations, and of the leasing by **BEL ENSO, LLC**, as Landlord, to **CAKE HAG CAKE AND DESSERT STUDIO**, LLC as Tenant, of the leased premises located at 880 Glenwood Ave, Suite E, Atlanta, GA pursuant to and as defined in the Lease between them attached hereto, does hereby, on behalf of itself and its successors and assigns, unconditionally guarantee the payment of all rent and the performance by Tenant (and any of Teannt's assigns) of all of Tenant's obligations under said Lease, and further covenants and agrees with said Landlord, its successors and assigns, as follows:

(a) That if an event of default, as defined in said Lease, shall have occurred and be continuing, guarantor will on demand well and truly pay to Landlord any and all payments that will become due to Landlord under the Lease, and will well and truly perform all of the covenants in the Lease to be performed by Tenant, and in addition will pay all damages that may arise in consequence of such event of default and all reasonable attorney's fees that may be incurred by Landlord in enforcing Tenant's covenants and agreements set forth in the Lease or in enforcing the covenants and agreements of the guarantor herein.

(b) That at Landlord's option, guarantor may be brought into any action or proceeding commenced by Landlord against Tenant in connection with and based upon the Lease or any provision thereof, or Landlord may proceed separately against guarantor, and recovery may be had against guarantor in any such action or proceeding or in any independent action or proceeding against guarantor without any requirement that Landlord, its successors or assigns, first assert, prosecute or exhaust any remedy or claim against Tenant, its successors and assigns.

(c) That in the event of any bankruptcy, reorganization, winding-up or similar proceedings with respect to Tenant, no limitation of Tenant's liability under the Lease which may now or hereafter be imposed by any federal, state or other law of regulation applicable to such proceedings, shall limit the obligation of guarantor hereunder, which obligation is coextensive with Tenant's liability as set forth in the Lease without regard to any limitations applicable to such proceedings.

(d) That this Guaranty shall remain in full force and effect as to any renewal, extension, modification or amendment of the Lease and as to any assignee of Tenant's interest under the Lease, without notice of same to guarantor or request that guarantor consent to same.

(e) That the validity of this Guaranty and the obligations of guarantor hereunder shall not be terminated, affected or impaired by reason of any action which Landlord might take against Tenant, or by reason of any waiver of or failure to enforce any of the rights or remedies reserved to Landlord in the Lease or otherwise.

(f) That Landlord's interest under this Guaranty may be assigned by it by way of security or otherwise.

(g) Guarantor waives notice of any and all events of default under the Lease and all notices or demands which may be given by Landlord to Tenant.

(h) If this Guaranty is signed by more than one guarantor, then obligations herein are the joint and several obligation of each guarantor. As used herein, masculine pronouns include the feminine and neuter. This Guaranty binds and inures to the benefit of the Landlord, guarantor(s) and their heirs, successors and assigns.

(i) This Guaranty shall only apply to the charges and obligations coming due or accruing under the Lease through December 31, 2019.

[GUARANTY SIGNATURE ON FOLLOWING PAGE]

[SIGNATURE PAGE FOR GUARANTY]

IN WITNESS WHEREOF, the guarantor has signed and sealed this Guaranty as of the __10__ day
of _____Oct_____, 2016.

GUARANTOR:

_____

**DR. MARK SAYEG**

Mailing Address _____185  Allen Rd_____

_____Atlanta  Ga  30328_____

Telephone Number: _____678-524-6900_____

# EXHIBIT B

LAW OFFICES
## SCHREEDER, WHEELER & FLINT, LLP
1100 PEACHTREE STREET, NE
SUITE 800
ATLANTA, GEORGIA 30309-4516

(404) 681-3450
FACSIMILE: (404) 681-1046

J. Carole Thompson Hord

E-Mail: chord@swfllp.com

February 26, 2020

Via Federal Express

Cake Hag Cake and Dessert Studio, LLC
880 Glenwood Avenue, SE
Suite E
Atlanta, GA 30316

Cake Hag Cake and Dessert Studio, LLC
1525 Terrell Mill Place SE
Unit H
Marietta, GA 30067

Re: Lease Agreement between Bel Enso, LLC ("Landlord") and Cake Hag Cake and Dessert Studio, LLC dated March 2, 2015 (the "Lease")

Dear Sir or Madam:

As a result of your continued default under the above referenced Lease, the Landlord hereby terminates the Lease. Please make arrangements to vacate and surrender the leased premises to the Landlord.

Sincerely,

J. Carole Thompson Hord

cc:    Ms. Ann Pegram (via e-mail)

K:\8840\18\default letter 2020.2.26.docx

2/26/2020                                    FedEx Ship Manager - Print Your Label(s)

   Shipment Receipt

**Address Information**

| Ship to: | Ship from: |
|---|---|
| Cake Hag Cake and Dessert Studio | Devin DeVito |

1525 Terrell Mill Place SE          1100 Peachtree Street
Unit H                              Suite 800
MARIETTA,  GA                       ATLANTA,  GA
30067                               30309
US                                  US
4046813450                          4046813450

**Shipment Information:**
Tracking no.: 777864591230
Ship date: 02/26/2020
Estimated shipping charges:  20.49 USD

**Package Information:**
Pricing option: FedEx Standard Rate
Service type: Standard Overnight
Package type: FedEx Envelope
Number of packages: 1
Total weight: 0.20   LBS
Declared Value: 0.00  USD
Special Services:
Pickup/Drop-off: Drop off package at FedEx location

**Billing Information:**
Bill transportation to: SWF-2020-611
Your reference:  8840/18
P.O. no.:
Invoice no.:
Department no.:

---

Thank you for shipping online with FedEx ShipManager at fedex.com.

**Please Note**

FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery, misdelivery, or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim. Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental, consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss. Maximum for items of extraordinary value is $1000, e.g., jewelry, precious metals, negotiable instruments and other items listed in our Service Guide. Written claims must be filed within strict time limits; Consult the applicable FedEx Service Guide for details.
The estimated shipping charge may be different than the actual charges for your shipment. Differences may occur based on actual weight, dimensions, and other factors. Consult the applicable FedEx Service Guide or the FedEx Rate Sheets for details on how shipping charges are calculated.

**FedEx**®

March 02, 2020

Dear Customer,

The following is the proof-of-delivery for tracking number: 777864591230

---

**Delivery Information:**

| | | | |
|---|---|---|---|
| Status: | Delivered | Delivered To: | Receptionist/Front Desk |
| Signed for by: | C.SWEENY | Delivery Location: | 880 GLENWOOD AVENUE SOUTHEAST |
| Service type: | FedEx Standard Overnight | | MARIETTA, GA, 30067 |
| Special Handling: | Deliver Weekday | Delivery date: | Feb 28, 2020 10:40 |

---

**Shipping Information:**

| | | | |
|---|---|---|---|
| Tracking number: | 777864591230 | Ship Date: | Feb 26, 2020 |
| | | Weight: | 0.5 LB/0.23 KG |

Recipient:
Cake Hag Cake and Dessert Studio,
1525 Terrell Mill Place SE
Unit H
MARIETTA, GA, US, 30067

Shipper:
Devin DeVito,
1100 Peachtree Street
Suite 800
ATLANTA, GA, US, 30309

Reference                    8840/18



Thank you for choosing FedEx

    Shipment Receipt

## Address Information

**Ship to:**
Cake Hag Cake and Dessert
Studio

880 Glenwood Avenue, SE
Suite E
ATLANTA,  GA
30316
US
4046813450

**Ship from:**
Devin DeVito

1100 Peacthree Street
Suite 800
ATLANTA,  GA
30309
US
4046813450

## Shipment Information:
Tracking no.: 777864564545
Ship date: 02/26/2020
Estimated shipping charges:  15.23 USD

## Package Information
Pricing option: FedEx Standard Rate
Service type: Standard Overnight
Package type: FedEx Envelope
Number of packages: 1
Total weight: 0.20   LBS
Declared Value: 0.00  USD
Special Services:
Pickup/Drop-off: Drop off package at FedEx location

## Billing Information:
Bill transportation to: Schreeder-New-561
Your reference:  8840/18
P.O. no.:
Invoice no.:
Department no.:

---

**Thank you for shipping online with FedEx ShipManager at fedex.com.**

**Please Note**

FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery, misdelivery, or misinformation, unless you declare a higher value,
pay an additional charge, document your actual loss and file a timely claim. Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including
intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental, consequential, or special is limited to the greater of
$100 or the authorized declared value. Recovery cannot exceed actual documented loss. Maximum for items of extraordinary value is $1000, e.g., jewelry, precious metals, negotiable instruments
and other items listed in our Service Guide. Written claims must be filed within strict time limits; Consult the applicable FedEx Service Guide for details.
The estimated shipping charge may be different than the actual charges for your shipment. Differences may occur based on actual weight, dimensions, and other factors. Consult the applicable
FedEx Service Guide or the FedEx Rate Sheets for details on how shipping charges are calculated.

**FedEx** ®

February 28, 2020

Dear Customer,

The following is the proof-of-delivery for tracking number: 777864564545

| Delivery Information: | | | |
|---|---|---|---|
| Status: | Delivered | Delivered To: | Receptionist/Front Desk |
| Signed for by: | S.WEENEY | Delivery Location: | |
| Service type: | FedEx Standard Overnight | | ATLANTA, GA, |
| Special Handling: | Deliver Weekday | Delivery date: | Feb 27, 2020 11:15 |

| Shipping Information: | | | |
|---|---|---|---|
| Tracking number: | 777864564545 | Ship Date: | Feb 26, 2020 |
| | | Weight: | 0.5 LB/0.23 KG |
| Recipient: | | Shipper: | |
| ATLANTA, GA, US, | | ATLANTA, GA, US, | |
| Reference | 8840/18 | | |

Signature image is available. In order to view image and detailed information, the shipper or payor account
number of the shipment must be provided.

Thank you for choosing FedEx

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| In Re: | ) | Chapter 7 |
| | ) | |
| THE CAK HAG CAKE AND DESSERT STUDIO, | ) | Case No. 20-64237-LRC |
| | ) | |
| Debtor. | ) | |
| | ) | |
| BEL ENSO, LLC, | ) | |
| | ) | |
| Movant, | ) | CONTESTED MATTER |
| v. | ) | |
| | ) | |
| THE CAK HAG CAKE AND DESSERT STUDIO | ) | |
| | ) | |
| Respondent. | ) | |

## **NOTICE OF HEARING**

PLEASE TAKE NOTICE that Bel Enso, LLC ("Movant") has filed a *Motion for Relief from Stay* seeking an Order modifying the automatic stay in this matter and authorizing Movant to proceed with the pending dispossessory proceeding seeking possession of nonresidential real property and to evict the Debtor from the premises (the "Motion").

PLEASE TAKE FURTHER NOTICE that the Court will hold a hearing on the Motion in Courtroom 1204, U.S. Courthouse, 75 Ted Turner Drive, SW, Atlanta, Georgia, at 10:00 A.M. on April 9, 2020.

Your rights may be affected by the Court's ruling on these pleadings. You should read these pleadings carefully and discuss them with your attorney, if you have one in this bankruptcy case. If you do not have an attorney, you may wish to consult one. If you do not want the Court to grant the relief sought in these pleadings or if you want the Court to consider your views, then you or your attorney must

attend the hearing.  You may also file a written response to the pleadings with the Clerk at the address stated below, but you are not required to do so.  If you file a written response, you must attach a certificate stating when, how and on whom (including addresses) you served the response.

Mail or deliver your response so that it is received by the Clerk at least two business days before the hearing. The address of the Clerk's office is: U.S. Bankruptcy Court, Room 1340, 75 Ted Turner Drive, SW, Atlanta, Georgia  30303. You must also mail a copy of your response to the undersigned at the address stated below.

If a hearing on the Motion for Relief from the Automatic Stay cannot be held within thirty (30) days, Movant waives the requirement for holding a preliminary hearing within thirty days of filing the Motion and agrees to a hearing on the earliest possible date.  If a final decision cannot be rendered by the Court within sixty (60) days of the date of the request, Movant waives the requirement that a final decision be issued within that period.  Movant consents to the automatic stay remaining in effect until the Court orders otherwise.

This 12th day of March, 2020.

/s/J. Carole Thompson Hord
J. Carole Thompson Hord
Georgia Bar No. 291473
chord@swfllp.com

*Attorney for Movant*

Schreeder, Wheeler & Flint, LLP
1100 Peachtree Street, N.E.
Suite 800
Atlanta, Georgia 30309-4516
Tel: (404) 681-3450
Fax: (404) 681-1046

2

CERTIFICATE OF SERVICE

This is to certify that the undersigned has caused true and correct copies of the within and foregoing MOTION FOR RELIEF FROM STAY and NOTICE OF HEARING ON MOTION FOR RELIEF FROM STAY to be served through the electronic case filing system (ECF) on all registered filers, and on the following parties by placing a copy of the same in the United States Mail, with sufficient postage thereon.

The Cake Hag Cake and Dessert Studio
880 Glenwood Avenue, SE
Suite E
Atlanta, GA  30316

Cameron McCord
Jones & Walden
699 Piedmont Ave, NE
Atlanta, GA 30308

Jonathan S. Adams
Office of the US Trustee
362 Richard B. Russell Bldg.
75 Ted Turner Drive, SW
Atlanta, GA  30303

This 12th day of March, 2020.

/s/ J. Carole Thompson Hord
J. Carole Thompson Hord
Georgia Bar No. 291473

Schreeder, Wheeler & Flint, LLP
1100 Peachtree Street, N.E.
Suite 800
Atlanta, Georgia 30309-4516
K:\8840\18\Bankruptcy\Motion for Relief from Stay.docx